Good morning, Your Honors. May it please the Court, my name is Stephanie Wu, and I represent the City of Sonora, Officer Hal Prock, and Chief Mace McIntosh. At this time, I'd like to reserve four minutes for rebuttal, please. All right. Assuming the Court is already familiar with the facts of the case, I'd like to move on to the legal merits of the case, since there are several issues that we are appealing on. But before I do that, since there are so many issues and we have a limited amount of time, does the Court have any specific order that it would like me to proceed in, or any specific issues it would like me to focus on to begin with, so we don't bypass it? I have a real fundamental question, and that is, you know, what standard one ought to use when the police are called to a school, and where one would get the standard? Do you think there's a standard? What do you think is the standard? Well, the standard, I believe, is in the Welfare and Institutions Code, which is what they applied when they received the call that there was an out of a juvenile who was beyond the control of the school, who was acting as his guardian at the time. They reported to the scene and acted based on the Welfare and Institutions Code section 601, 625, and 626. Well, that gets you to the scene of the crime, so to speak, or the scene of the situation, we'll call it. Does some version of the Fourth Amendment apply if they decide to seize somebody? Yes. And I believe that that is actually integrated within the Welfare and Institutions Code, as it provides that in order to take the minor into temporary custody, that you have to have reasonable cause to believe that he falls into one of the categories set forth in section 601, which in this case we contend is the beyond the control element. But also this bill. Let me ask you, does it have to have some reasonable, so it's a reasonableness? Yes. I mean, there's the reasonableness standard that's built into the Welfare and Institutions Code, but also there's the special needs standard, which at this point it's not quite clear how the two would really interact, as the special needs standard in and of itself is the application of that is difficult and it's a little bit vague. Well, who's the custodian? He's – if you first let's go to the California statute there. Is that clear to me? The statute is even kicked in here. Who's the custodian? I mean, not the school. It's not the custodian, is it? Well, during the trial, even plaintiff's expert acknowledged that for the purposes of this statute, officers are trained at least, and I'm not saying what the legislative intent was, but they are trained that the school acts in loco parentis, that they are the custodian and or guardian of the student while the student is at school. And at the point that they're called, of course, they have a reason to show up because the school calls them, but what's the evidence once the officers are there that you have a child beyond control when you basically have a kid that's just sitting there? I mean, is that all you have to do? A kid that's sitting there, school says he's out of control, but he's just sitting there, he exhibits nothing. They say their testimony is such that nothing's happening. He might be a little insolent because he's not talking back to them. So what's the evidence that he's out of control? That's one of the issues that makes this a little bit unclear, which is that we don't really know what would establish, quote, reasonable cause to believe that he falls into one of the categories set forth in 601. Because first, with the special needs standard, when you are acting in a non-law enforcement capacity, as these officers were, and as plaintiff's expert acknowledged, the special needs standard kicks in, but then they report and they act based on the welfare and institutions code. Well, the welfare and institutions code, though, in case law examining it, especially or particularly these sections relevant to this case, find that probable cause is not the standard. And in a case, R.K., versus a city, held that, and it's not published, of course, but the one cited by plaintiff states that there is no definition or meaning yet that has been interpreted with regard to the term reasonable cause. It's not in the statute, and it wasn't able to find any case law that shed any light on that. So in that particular instance, the Court applied a probable cause standard based on the penal code. But several cases go to the Supreme Court case, where they are looking at the seizure when the officers show up, and that's TLO, and they basically say, well, at least for the school, you have to have this reasonableness under all circumstances. But then the footnote is basically saying we're not talking about when the police show up. So they're not suggesting that it's somehow lower than reasonableness under all circumstances. You mean lower than what would be required of a school administrator? Right. No, we're not suggesting that. And a school administrator, would that be reasonableness under all circumstances? Is that sort of the standard that we would be looking at? I mean, that would be our guess, or something lower, just because the term reasonable cause is used in the Welfare and Institutions Code, and it's acknowledged that, you know, the purpose of the Welfare and Institutions Code is not lower than that. Well, I guess it's because it's unclear how the special needs standard would come what the effect of that would be when interpreted in concert with the Welfare and Institutions Code. So if the special needs standard holds that there's a lower standard in a school setting, then if you're applying the Welfare and Institutions Code, which already has a lower standard of reasonable cause, then what effect does it have on that? It's not very clear there either. But prior to the time this particular individual, CB, was handcuffed and seized, had any court applied the special needs standard from TLO to a situation like this one? I mean, do we have any other cases out there that have dealt with a similar issue? No. We haven't been able to find anything that's similar. The only thing that we have found is that officers that are acting in a non-law enforcement capacity, that the standards are lowered and that the special needs standard would apply, kind of similar to as it would to a school official. The district court, I think, relied on the Green case in applying the special needs standard. Was that error because Green had not been decided when the CB was seized and handcuffed and taken away? Yes. Because at that time when the district court issued its opinion, I think it was, I think it was September 30th of 2011, and then the Supreme Court vacated the section that the district court relied upon in Green v. Camreta. It completely vacated that section, saying the court's error, you know, relying on Green if Green hadn't been decided. Well, it leaves things up in the air, basically. It didn't create any precedent as far as whether or not the conduct in Green v. Camreta is in violation of the Fourth Amendment, of his Fourth Amendment rights. Were they clear at the time, then, as to what they could do under the circumstances? Yes, absolutely. Should the officers have gotten qualified immunity, then? I'm sorry? Should they have gotten qualified immunity? Yes. And that's what we, you know, the defendants tried multiple times to have the district court determine that we were entitled to qualified immunity on these exact bases. You know, nothing different, really just arguing that not only was our conduct reasonable, but that the law was just not established, the contours of the law was not clearly established at the time of the instance. So we thought that we were acting reasonably, and I don't think that it was so unreasonable that you could say that not one reasonable police officer would believe that the defendant's conduct was unlawful, was lawful. I'd like to turn to the verdict form and the colloquy. Can you help us understand what happened and whether or not what the court did was proper or not proper? Well, we acknowledge that, of course, a district court or a court, if the jury has any questions about that, they would ask that for the jury. But in this instance, the court, and I'm not saying that it was intentional, but the court, I mean, quite clearly from the record, confused things substantially. The jury kept coming back with further and further questions that exhibited that they were getting even more mixed up every single time that they asked a new question. So do we have, other than in the transcript of the colloquy, do we have anywhere in the record the actual verdict form that was filled out first? Because as I understand it, they filled out the first eight questions and then had questions to the judge as to what they should do with question 9 if they'd filled out yes to question 8, and the judge really never answered those questions, did he? Right. And it's – that is a mystery at this point. We do not know where that initial verdict form is, so we can only go by the transcript as well, which is kind of vague. Is it clear from the transcript and the colloquy that the jury had, in fact, found – answered question 8, I think it's yes, and found that there had been a showing of the – that the city had proved qualified immunity? Affirmative defense. Thank you. Yes. That – that part is undisputed. The part that is a little bit gray is with regard to question 9 and the false imprisonment, because it seemed in the beginning when he – the judge first said that the verdict was inconsistent, that it – that the jury had failed to answer any part of question 9, you know, the actual elements, causation, and the affirmative defense. But then later when the final verdict came out, the one that was eventually entered, based on the Court's comments, it implied strongly that the jury had answered the – the affirmative defense verdict question. No, we don't know. The jury started over and filled out a verdict form and said, here it is, and the jury was told and they all agreed to it. What's wrong with that? Well, it would seem that, well, of course, something happened between the time of the first verdict and the final verdict that was entered. And the only questions that they had were mainly in the beginning was about whether if they found all of the elements set forth in the jury instructions with regard to the affirmative defense for IAED, whether they should answer yes on the verdict form. And the Court didn't answer that question very clearly. As a jury, they're laypeople, and so they're listening to the judge speak, and you're inconsistent if you find all of the elements in the jury instruction and answer it yes. But that's misleading. And so when the Court harkens back to language that's found in the jury instructions for the Fourth Amendment claims, I think that that leads the jury to go back and reexamine things, especially when the Court keeps saying, well, but if you found this, though, then that wouldn't be the case. And so if the Court keeps implying that, it's making the jury feel like perhaps they've made a wrong decision or are going to come back with another inconsistent verdict and have to go back again to re-delivery. Kennedy. Just take the verdict form as it was finally filled out. What's wrong with that? Well, nothing is wrong with the way that it was filled out. Or do you mean that you lost the case, then? And yet the verdict form is properly filled out. Is there something inherently wrong with the form of the verdict, the final verdict form itself? The actual language on the verdict form? I mean, there are still some problems with regard to the, you know, if you answer this question, this, then you should move on to this next direction or, sorry, next question. Some of those are still messed up, I think, with regard to the verdict form. Why do I want to watch your time? You're down to a minute. Oh. Can I ask you just a real brief question before you sit down? Yes. Am I right in recollecting that you did not appeal the denial of your Rule 50b motion as to the Monell claim? I'm sorry. We, what? Did not appeal the denial of your Rule 50b motion as to the Monell claim. Am I right in that? Oh, no. We are, but that's a, that's a Where in your opening brief did you do that? It's based on the argument that the Court should not have admitted the That's an evidentiary issue. I'm saying did you appeal the denial of the Rule 50b motion. I just don't remember seeing that argument teed up in your opening brief. If you think you did, please point me to it. But otherwise, I would be inclined to think you've waived the denial of, the appeal of that denial. And in my rule, I mean, in my rebuttal, I will point it out. Great. All right. Good morning, Your Honors. John Martin appearing on behalf of the minor plaintiff. I suggest to this Court that the conduct of the police officers in this case was outrageous. I'm normally in courts representing police departments. In this case, this Court does not have this case in a vacuum, unlike some of the other cases that it's heard this morning, where it's here on summary proceedings. We actually had a jury trial here, and this jury not only found that these police officers, including a chief of police, did not act reasonably, but that they acted with malice and in reckless disregard of the plaintiff's rights. And they did not make that finding by a preponderance of the evidence. Under the Court's instructions, they made that finding with clear and convincing evidence. Well, tell us what the police officers did that was wrong. I will tell you right now, Your Honor. These three officers, apparently a slow day, three different police cars, three different police officers, all arrive on a dispatch of a juvenile out of control. They arrive and they meet an 11-year-old, 4'8", 80-pound boy, fifth grader, sitting on a seat in a playground who won't talk. Well, they arrived because, don't forget, that the school had called 911 and said they needed help. It said out-of-control juvenile. I believe I said that. All right. But when they arrive to the playground, they don't find an out-of-control juvenile. They find an 80-pound kid sitting on a park bench. Yeah, but they're entitled to rely on what the school officials tell them. To get him there, sure. Sure. Right. There's no doubt about that. But once they get there, the decision is now theirs, not the other. But they're entitled to rely on what the school officials told them. Correct. And they were told quite a few things, actually, about things that had happened before they got there. Okay. One would think that they might inquire, you said this boy was out of control. What did he do? They never did. To this day, we don't know why they said he was out of control, because nobody ever asked that question. One of the teachers said, well, he missed his medication this morning. They didn't ask what medication. What was he taking medication for? Did they know that? Could I just ask you, I thought that was even after they had seized him, but maybe I misunderstood that they revealed that point. That they were the only thing that was ever said, and actually it was never even said. She went like this, and somehow they were supposed to read that to mean medication, and she never said he was a runner. She did this, and they were supposed to assume that. But they the police officers to this day don't know on what basis somebody said he was out of control. They personally never observed any indicia that he was out of control. Everything they observed the child would be contrary to the information they were given. And yet, within three minutes, they have this kid in handcuffs and in the back of a caged patrol car. They do try to make some effort to find out what's going on with this kid. It's not like they just take at face value what the school officials tell them. They do make some effort to, well, let's figure out what's wrong with this kid, and he's completely nonresponsive. Yes. Okay. So why at that point aren't they entitled to rely on? Well, you know what? We weren't here. This is what these school officials are telling us. We don't want this kid running out into traffic and getting hurt, so maybe we better do something rather than just go home. No. The police officers testified, and that's in the record. They weren't concerned the kid was going to run out of traffic and get hurt. The closest thing is a football field away. They had no justification whatsoever. I think they said that they were concerned that if he did run, they could catch him before he got there, but they might have to tackle him and he might be injured in the process. Yeah. So that's the justification for being a custodian. So because you're worried that the kid may run away from you, then you can handcuff him? I mean, I guess I'm a little bit surprised that you have this attitude as though these officers were out to, I don't know, to what, inflict the... The jury is so foul. Well, I guess I don't read the record that way. You know, if anything, if the officers hadn't done anything and the kid had bolted and gotten hit by a car, you'd be suing the school district and the police for not having done their job, right? And, no, but had – I tell you, when I would have sued the school district, if those medications that they never asked what they were had, for instance, been for epilepsy, and this problem with this kid staring at him was an absence seizure, and they then handcuffed him and he had a grand mal seizure in the back of the police car and died, then I'd be suing them. You did sue the school district, and you settled with the school district, as I understand it. We're talking about what the police officers were told when the call came in, what they were unable to learn. They didn't learn much more because the boy wouldn't talk to them. What were they to do? Were they – are you suggesting that they – what they needed to do then was say, well, we're out of here. We can't get any further information, so they should leave? Is that what you're suggesting? My suggestion, Your Honor, is that a police officer – I've never had a case where a police officer is asked too few questions. Usually, they're being – evidence is being thrown out because they detained somebody for too long a period of time and asked too many questions. Here, they ask no questions. Well, they asked some questions. They wouldn't talk to them. Isn't that right? And had they asked one question to the teacher who was there as to why he was taking medication, she would have said, he takes medications because if he doesn't, this is what happens. The real problem here is obviously you don't have to rely on the child, say, oh, I'm out of control. It's – your argument really is that they have a reason to get there by virtue of the emergency phone call. Phone call. But once they're there, then they have an obligation to take some reasonable steps to determine if he even fits in the statute, correct? Correct. And – A statute of which they were unaware until trial. Right. A statute which is not cited in their police report nor testified to in their depositions. And it doesn't, you know, completely match up with what's happening here. So my question is, then, let's take it with and without the statute. If you have no statute and they show up, do you believe there's a basis under which they could have restrained him in order to transport him to the uncle's house? No. They had no right to transport him anywhere. They had no right to do that. And they had no right to tell him that he was there. He, in fact, was on – he was a special ed student that was on a specific plan for this specific condition that he was exemplifying were there. But nobody told him that. Nobody told the police officers, nor did the police officers ask, that this, in fact, is something he had done on many occasions. And so does it now – the second part is we do have the statute here, and it uses the words, out of control, which were the words used in the dispatch call. How does that change things? Does it matter that they don't know of this particular statute? I don't think it probably is in a practical sense that it does, because we don't know, nor did they have any basis to know that he was out of control. They didn't see anything. When they get there, the things they know are the little running fingers, correct? Running and medicine. And then the thing across the mouth. And they don't even have it from the teacher. They have it from the dispatcher that he was reported to be out of control. But they – and they don't question the teacher. No. They don't question the other teacher. There's two teachers sitting. They don't question either one of them. They have a whole office of administrators. This kid is on a 504 plan. No suggestion, for example, can you take him back to the school or any of this? No. Was the law unsettled at that time? I mean, there's cases in 2000 that – that pointed on the responsibility of the duties of police officers under these situations. And in – more recently, the Second Circuit in 2012 and 13 said that the law recognized the unsettled nature of the law concerning these type of interview potential victims. There's – I don't believe there's any – Why is the lower court err in not granting qualified immunity here? Because there is no – there's absolutely no evidence whatsoever that these officers acted reasonably in any manner whatsoever. And, in fact, we have a fact finding, a unanimous fact finding by the jury that they not only weren't acting reasonably, they were acting in extreme disregard and with malice. Where does the reasonableness standard come from, in your view? In this situation, you know, the police officers could argue to this court with a straight face had they asked the appropriate questions about, well, what medication is he on? I want to step back one from that. The question we have to look at on qualified immunity is whether the law was clearly established. And then you're saying, well, reasonableness is the standard. I'm asking you, where do we look as the source of that standard? I'm asking, well, on qualified immunity, we have to determine is the law established, clearly established. Where does the reasonableness standard come from, in your view? I'm still not tracking with you. I'm saying that if they're going to arrest anyone, whether it be a child, an 80-pound child or a human or a grown adult, they need to have reasonable cause to believe that they have some right to arrest them. Okay. Where does that come from? Where does the reasonable cause come from? What's the case? What's the officer says? Oh, I know. Now I have to have reasonable cause. I mean, usually they have to have probable cause. You're telling me, and that's in the normal Fourth Amendment situation, now you're saying, well, actually, it's reasonable cause. And I might actually agree with you, but I'm asking you, what's the source of that? Why do the officers know that they need reasonable cause? Hopefully, at some point in time, they've received some type of training. I don't know. I mean, it has to be in the law. It has to be in the law. I mean, police officers know that you can't just put handcuffs on somebody for drill. I mean, they you have to have a reason, and their reason here is that some of their dispatchers say he was out of control. That's all they have. Maybe just the Fourth Amendment would be a good answer. Possibly, would you look there? I think that's an excellent possibility. I mean, what case do you rely upon to show that at the time they were there and took the boy away, that it was unreasonable because the law was established that they shouldn't have put him in handcuffs and taken him home? I can't cite you a case, Judge. To me, there's this black-letter law that you can't handcuff somebody unless you have a reason to do it. He had not violated any statute. They had not observed any conduct which led him to believe that he was out of control. And I think that's a good example of a case where you can't just say, well, he's out of control, or the school fears that he's going to run away and harm himself. That would be arguable, that they would have reasonable cause if that were true, but they had no evidence other than what a dispatcher told them. I want to change the dynamics here a little bit, because I'm trying to understand that verdict form in the colloquy. Didn't the judge – the judge said in the colloquy, I think, three different times, that your verdict has to be consistent, has to be consistent. That's not true, is it? Well, it's not entirely true, but to the extent that it's not entirely true, because there were four claims and it didn't – you didn't have to find on the State claims in order to find on the Federal claims and vice versa, but the trial judge said, and there should be consistency between your findings. That was wrong. Isn't that true? Well, no, I don't think so, because I think the way – I think what the trial judge meant to say is you can't find no liability and yet award damages. That was the inconsistency. And I think that can easily be explained, as this Court has as much experience as I do in trial matters, these verdict forms are horrendous, and very few juries or judges or lawyers ever understand it, because they have all these either-or, either-ors. Even when they got to the final verdict form, which is the one that's signed and is an exhibit, initially, they had – the foreman had checked all the no's when he meant to say yes. And as soon as the judge – When we first got to asking the questions, the jury had filled out the first eight questions and they answered on the affirmative defense on claim 8, and they asked, how do we then fill out claim 9 – or question 9? Wasn't it a very easy, you say – I've forgotten whether it's no or yes, but I mean, it was a – it was clearly – if you answered yes to question 8, then clearly the – there should have been an easy answer to question 9. I agree, but to me – to me, it's as simple as what ended up happening with the final verdict form is the foreman checked the wrong boxes, and that's what made it the inconsistent. In fact, that is not how the jury voted. They had voted the opposite of that, and he had checked the wrong boxes, because he did the same thing, or she did the same thing in the final verdict form, and they had to change those. That's why in the exhibit where they had to erase the first answer and sign, because you just made a ministerial thing and checked the wrong boxes. The judge in the colloquy went on for, I think, 17 pages in the transcript explaining and over-explaining and re-explaining and, in my opinion, confusing the whole problem. There's no opportunity in that – in that context for the city to object, is there? I mean, the Court goes on. Normally, we say, here's what we're going to tell the jury, what do you think, lawyers, and they tell us, and then we – at least you've had a chance to respond here. That didn't happen, did it? No. As soon – that certainly has happened to me before. And when the judge starts saying something other than what he said in Chambers, I'll stand up and object right there and ask for a sidebar. I'm not going to sit on my fanny and not do anything. There's absolutely no irregularity or no room to – to sidestep on the final verdict. And even – even this bogus juror that in the thing, he said that we awarded – we awarded more money against the city because of this custom and practice they had. Well, they wouldn't even – he wouldn't have used the word custom and practice unless he had found a civil rights violation. Well, was there any evidence, any evidence of any kind, dealing with a custom or practice concerning – just a moment – concerning the seizing as opposed to the handcuffing of the juvenile? No, not in the seizing, the handcuffing. So there's no evidence of a custom or practice on the seizing, and yet the jury found liability there. Other – other than – other than the nurse – the vice principal disciplinarian saying that they always take kids off in the police car, even though they have a community  So there's no evidence of a custom or practice. It has nothing to do with the seizing element. It has to do with the – the other claim for handcuffing, doesn't it? Well, no, seizing, to the extent that they're taking you off with that against your will. Thank you. With regard to Judge Watford's last question as to whether we are appealing our Rule 50B motion, on page 1, under jurisdiction, the second paragraph, we say that we are appealing the final judgment of the court in denying our Rule 50 and 59 motions, which were in the same. You have to give us an argument, though, as to why it was improperly denied as to the Monell claim, if that's what you're trying to appeal. Oh, I'm sorry. I forgot that you were just speaking about the Monell claim itself. Well, yeah, I mean, basically, our Monell claim is based on the evidentiary problem, so, yeah. Sorry, I thought you were saying that we didn't appeal that one at all. You just want a new trial on that claim. Yes. All right. Your time is up, but if you have a summary comment, we'd like to hear it. Well, I think that it's quite clear if you review all of the case law. Well, first, I'm sorry, let me just say very quickly that the burden is on the plaintiff to show that the law is clearly established, and as he just admitted or acknowledged during his argument, plaintiff's argument, he's unable to point to any law that shows that it's clear that the law is clearly established at the time of the incident that, you know, would govern the officer's conduct and deems it unreasonable and a constitutional violation. So with that regard, I think that it's quite clear that the officers did not have any basis to believe that their conduct was unlawful. Thank you. All right. Thank you. The case just argued is submitted, CB v. Sonora.
judges: Zilly, McKeown, Watford